IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:24-cv-01433-CNS-TPO

ROCKY MTN. REBAR INC., a Colorado corporation and
ROBERT GARCIA, JR., individually,

    Plaintiffs,

v.

WANZEK CONSTRUCTION INC., a North Dakota corporation and
LARRY BYRKET, individually,

    Defendants.

## ORDER

Before the Court is the Special Motion to Dismiss Certain Allegations and Claims in Plaintiffs' Complaint Pursuant to Colorado's Anti-SLAPP Statute, C. R. S. §§ 13-20-1101 *et seq.*, filed by Defendants Larry Byrket and Wanzek Construction, Inc. (Wanzek). ECF No. 24. For the following reasons, the Court DENIES the motion.

### I. BACKGROUND[1]

Wanzek is a construction company that specializes in renewable energy projects. ECF No. 1, ¶¶ 3, 10. Rocky Mtn. Rebar (RMR) provides construction services on projects, including wind farms. *Id.*, ¶ 8. Mr. Garcia is the owner of RMR, and Mr. Byrket is employed by Wanzek. *Id.*, ¶ 9.

---

[1] The background facts are taken from the well-pleaded allegations in the complaint and interpreted in the light most favorable to Plaintiff. ECF No. 1; *see Porter v. Ford Motor Co.*, 917 F.3d 1246, 1248 n.1 (10th Cir. 2019); *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016).

1

On January 14, 2020, Wanzek and Rocky Mtn. Rebar (RMR) entered into a Master Subcontract Agreement (MSA), which included terms and conditions governing their relationship. *Id.*, ¶¶ 11–12. On May 30, 2023, Wanzek contracted with RMR to provide rebar installation for a wind power project in Mississippi, the Delta Wind Farm. *Id.*, ¶¶ 13–14. RMR was set to begin work around August 14, 2023. *Id.*, ¶ 15. Wanzek informed RMR that it would need to obtain a Mississippi State construction license. *Id.*, ¶ 16. RMR applied, but was told that the licensing process would be delayed for about six weeks. *Id.*, ¶ 17. Rather than wait for the license, Wanzek hired Mr. Garcia directly so that the work could commence. *Id.*, ¶ 19.

On August 15, 2023, Wanzek required Mr. Garcia to produce physical copies of his work authorization documents. *Id.*, ¶ 23. Mr. Garcia brought around 30 men to the project site. *Id.*, ¶ 26. Mr. Garcia alleges that each of these workers was legally permitted to work in the United States. *Id.*, ¶ 27. On August 30, 2023, Mr. Byrket sent Mr. Garcia an email, with "numerous people" copied, claiming that nine of the workers were unauthorized to work in the United States and that these men did not have legitimate documentation. *Id.*, ¶ 28. Plaintiffs allege that Mr. Byrket knew that at least some of these workers had documentation. *Id.*, ¶ 31. On August 31, 2023, Mr. Byrket sent Mr. Garcia another email with the subject line "RMR Employee's [sic] that are allowed to work," stating that "[t]hese are the only folks allowed to work at the Delta Wind Farm, all others cannot be onsite." *Id.*, ¶¶ 33–34. The email identified at least five workers. *Id.* Plaintiffs claim that this email is false because the workers were lawfully permitted to work. *Id.*, ¶ 36. Around the same time, Wanzek provided offer letters to four of the individuals that Mr. Byrket claimed lacked legal authorization to work. *Id.*, ¶ 38. Wanzek provided other

2

workers with contact information for a competitor to apply to work on the project with that competitor. *Id.*, ¶ 39. On September 1, 2023, Mr. Byrket sent another email, with six people copied, writing that "with all the manpower issues, Wanzek has no choice but to bring in another contractor to install rebar." *Id.*, ¶ 41.[2]

Plaintiffs allege that these three emails were defamatory, disparaging, and false. *Id.*, ¶ 40.

Afterward, Mr. Garcia learned that RMR was not awarded multiple jobs because of the September 1 email and because of a statement that Mr. Garcia was hostile to Latin workers. *Id.*, ¶¶ 45–47, 51. Plaintiffs allege that RMR has been blackballed by every major company working on wind farms because of these allegedly false statements. *Id.*, ¶ 54.

Plaintiff brought this lawsuit on May 21, 2024, bringing claims for defamation, tortious interference with contract, tortious interference with prospective business advantage, and breach of contract. Defendants filed the present special motion to dismiss the tort claims under Colorado's anti-SLAPP statute, C.R.S. §§ 13-20-1101 *et seq.*[3]

## II. LEGAL STANDARD

In 2019, the Colorado legislature enacted the Anti-SLAPP statute, allowing courts to dismiss frivolous claims brought with the intent to chill a person's constitutional rights, particularly the right to free speech. C.R.S. §§ 13-20-1101 *et seq.* The statute allows defendants to file a special motion to dismiss where the claim arises "from any act of that person in furtherance of the person's right of petition or free speech," including, as relevant here, "conduct or communication(s) in furtherance of . . . the constitutional right

---

[2] The full email reads: "Bobby with all the manpower issues, Wanzek has no choice but to bring in another contractor to install rebar. Our HR dept will be terminating RMR EE's that are working for Wanzek effective immediately. Please contact Ryan Janowicz with any further questions."
[3] "SLAPP" stands for "Strategic Lawsuits Against Public Participation."

of free speech in connection with a public issue or an issue of public interest." C.R.S. §§ 13-20-1101(2)(a)(IV), 13-20-1101(3)(a).

Colorado courts have held that, because Colorado's statute is relatively new and is largely identical to California's anti-SLAPP statute, it is appropriate to apply California anti-SLAPP caselaw. *See, e.g., Moreau*, 641 F. Supp. 3d at 1132.

Courts apply a two-part test to determine whether to grant the special motion to dismiss. First, the Court must determine whether the defendant "has made a threshold showing that the conduct underlying the plaintiff's claim[s] falls within the scope of the anti-SLAPP statute." *Moreau v. United States Olympic & Paralympic Comm.*, 641 F. Supp. 3d 1122, 1134 (D. Colo. 2022) (citations omitted). In other words, the defendant must make a "prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's constitutional right to free speech." *CoreCivic, Inc. v. Candide* C 20-03792 WHA, 2022 WL 16823696, at *1 (N.D. Cal. Nov. 8, 2022). If the plaintiff successfully makes a prima facie showing, the Court then determines whether, based on the pleadings and affidavits, the plaintiffs have "established a 'reasonable likelihood' of prevailing on [their] claim." *Moreau*, 641 F. Supp. 3d at 1134. Under this second step, if an anti-SLAPP motion "mounts a legal challenge, courts assess the motion under Federal Rule of Civil Procedure 12(b)(6)" and consider whether a claim is properly stated. *Id.* at 1129. If the motion mounts a factual challenge, courts assess the motion under Federal Rule of Civil Procedure 56. *Id.*

### III.  ANALYSIS

Having considered the parties' briefing and relevant legal authority, the Court denies Defendants' motion.

4

### A.   Application of Colorado's anti-SLAPP Law in Federal Court

First, Plaintiffs argue that Colorado's anti-SLAPP statute does not apply in federal court because it conflicts with Rule 1 and Rule 56 of the Federal Rules of Civil Procedure. However, this Court has previously held that Colorado's anti-SLAPP law does apply in federal court. *See, e.g.*, *Moreau*, 641 F. Supp. 3d at 1132. This Court previously reasoned that Colorado's anti-SLAPP statute is interpreted, like California's, to eliminate conflicts between standards in the Federal Rules of Civil Procedure and the anti-SLAPP statute. *See, e.g., CoreCivic, Inc. v. Candide Grp., LLC*, 46 F.4th 1136, 1138 (9th Cir. 2022). The Court follows this precedent and reiterates that Colorado's anti-SLAPP law applies in federal court.

### B.  Prima Facie Case

In applying Colorado's anti-SLAPP framework, the Court first considers whether Defendants have made a prima facie showing that Plaintiffs' suit arises from Defendants' constitutional right to free speech, and thus falls within the scope of the anti-SLAPP statute. The Court finds that Defendants have failed to meet their burden.

Colorado's anti-SLAPP statute lays out four "acts in furtherance of the right of petition or free speech . . . in connection with a public issue" that come within the purview of the statute:

> I) Any written or oral statement or writing made before a legislative, executive, or judicial proceeding or any other official proceeding authorized by law;
>
> II) Any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body or any other official proceeding authorized by law;

> III) Any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; or
>
> IV) Any other conduct or communication in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

Colo. Rev. Stat. Ann. § 13-20-1101(2)(a)(I)-(IV). The parties do not dispute that the speech in question here would only fall into category IV, if at all.

The precise boundaries of what constitutes a public issue are unclear. *See Rivero v. Am. Fed'n of State, Cnty., & Mun. Emps., AFL-CIO*, 105 Cal. App. 4th 913, 924 (2003). However, generally, courts have interpreted "a public issue" broadly.[4] California courts have generally identified three categories of speech on public issues: either it concerns a person or entity in the public eye, involves "conduct that could directly affect a large number of people beyond the direct participants," or relates to a "topic of widespread, public interest." *Id.* Colorado courts have articulated what constitutes a matter of public interest as "an issue about which information is needed or appropriate"; "a subject of legitimate news interest"; an issue "fairly considered as relating to any matter of political, social, or other concern to the community"; or an issue that "involves the use of names, likenesses or facts in giving information to the public for purposes of education, amusement, or enlightenment when the public may reasonably be expected to have a legitimate interest in the subject." *L.S.S. v. S.A.P.*, 523 P.3d 1280, 1287–88 (Colo. App. 2022) (citations omitted); *City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004); *McIntyre v. Jones,* 194 P.3d 519, 525 (Colo. App. 2008) (citation and quotations omitted). Other courts have defined a public issue as "when the public may reasonably be expected to

---

[4] Most of the "public issue" caselaw is in the area of defamation law.

6

have a legitimate interest in what is being published." *Williams v. Continental Airlines, Inc.*, 943 P.2d 10, 17 (Colo. App. 1996); *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1035 (10th Cir. 2013) (citations omitted). In making this determination, courts analyze the "content, form, and context of the statements in conjunction with the motivation or 'point' of the statements as revealed by the whole record." *McIntyre v. Jones*, 194 P.3d 519, 525 (Colo. App. 2008).

In the context of workplace disputes, "unlawful workplace activity below some threshold level of significance is not an issue of public interest, even though it implicates a public policy." *Rivero*, 105 Cal. App. 4th at 924. In *Rivero*, a union made statements alleging unlawful supervision of eight staff members. The court found that the statements did not involve a public interest because there was no media attention on the parties, the statements only affected the individuals directly involved, and the issue of workplace misconduct did not reach a certain threshold of significance. *Id.*

Defendants argue that the emails involve speech about a public issue: immigration policy. *See* ECF No. 24 at 10. However, Defendants shortly thereafter described the issue in much more narrow terms: "whether workers put forth by Plaintiffs for Wanzek's project had the legal status and proper documentation to work on the project." ECF No. 24 at 10. These statements do not involve immigration *policy*; they involve a private workplace dispute about individual employees' compliance with immigration laws.

Defendants also argue that Wanzek is a large construction company and so its compliance with federal immigration laws, even with regard to private individuals, is an area of public interest because it affects members of the public. *Id.* The Court disagrees. As in *Rivero*, the statements only involved Mr. Garcia and the individuals who were told

7

not to work at the project site. Indeed, the context and "point" of the speech indicates that it is not about a matter of public interest: they were private emails communicating business decisions (the status of RMR's employees) to only those people involved in the decisions. While the document verification policy arguably affects a large number of people, Wanzek's routine application of that policy does not.

Significantly, the cases Defendants cite involve speech that is "published to other consumers," or were intended as a "warning" to other people in the industry. *Wilbanks v. Wolk*, 121 Cal. App. 4th 883, 898-900 (Cal. App. 2004) (statements regarding incompetence of a brokerage concerned a public issue because the statements were a warning not to use the brokerage's services); *Chaker v. Mateo*, 209 Cal. App. 4th 1138, 1146 (Cal. App. 2012) (defendants' statements published to other consumers implicated a public issue); *Yang v. Tenet Healthcare Inc.*, 48 Cal. App. 5th 939, 948–49 (Cal. App. 2020) (a "hospital's directive that doctors should no longer refer patients to" an allegedly incompetent doctor addressed a public issue). Defendants' argument that the emails were allegedly communicated to outside parties is similarly unconvincing. Defendants point to the allegation that "Mr. Garcia subsequently learned that two other companies, called Mortenson and Blattner, two of the biggest wind farm builders, were steering contracts away from Rocky Mtn. Rebar based on a statement that Mr. Garcia was hostile to Latin workers." ECF No. 1, ¶ 51. However, there is no indication that Plaintiffs are referring to the emails in this allegation, nor is there any evidence that a statement that Mr. Garcia was hostile to Latin workers appeared in the emails.

Defendants also argue that the speech here is "directed toward policies pertaining to discrimination or which tends or seeks to expose discriminatory practices" or is akin to

8

speech about "hiring and abuse of undocumented workers," and so touches on a matter of public concern. ECF No. 45 (Reply) at 7 (citing *Barrett v. University of Colorado Health Sciences Center*, 851 P.2d 258, 264 (Colo. 1993); *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767 (9th Cir. 2022)). However, while these issues are clearly matters of public interest, the emails do not fall in those categories.

In the cases cited by Defendants, the speech at issue offered commentary about discrimination, immigration, and bigotry; that is, it sought to expose practices, or was "directed toward" discriminatory policies. The speech here is not similarly targeted to the policy or issue, but rather is a rote application of Wanzek's documentation verification policy. To illustrate, the emails do not discuss Wanzek's policy of verifying work authorization documents, state any opinion on the policy or on Mr. Garcia's purported failure to comply with it, or comment on or make an example of Mr. Garcia's lack of compliance. The emails do not connect Wanzek's verification policies with federal immigration requirements, or provide any critique or commentary on immigration policies, or even Wanzek's policies, at all. The emails simply inform Mr. Garcia that some of his employees were not in compliance with Wanzek's documentation verification requirement and thus could not work on the site. The motivation or "point" of the emails was, therefore, not to comment on a matter of public interest; it was to inform Mr. Garcia that his workers were not complying with its policies.

Thus, Defendants do not meet their burden of showing that Plaintiffs' claims arise in the context of the anti-SLAPP statute.

## IV. CONCLUSION

Consistent with the above analysis, Defendants' Motion to Dismiss Certain Allegations and Claims in Plaintiffs' Complaint Pursuant to Colorado's Anti-SLAPP Statute, C. R. S. §§ 13-20-1101 *et seq.*, ECF No. 24, is DENIED.

DATED this 21st day of March 2025.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge